# EXHIBIT G

CRAIG KEITH                                           December 02, 2016

```
                                                           Page 1
 1                    STATE OF MICHIGAN

 2      IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

 3

 4    ROBERT CHUCHRAN, an individual,

 5                    Plaintiff,

 6    -vs-                           Case No. 2016-2576-CD

 7    COUNTY OF MACOMB, a political    Hon. Diane M. Druzinski

 8    Subdivision of the State; and

 9    ERIC SMITH, an individual,

10    sued in his official and

11    personal capacity,

12                    Defendants.

13    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~/

14    DEPONENT:    CRAIG KEITH

15    DATE:        Friday, December 2, 2016

16    TIME:        1:06 p.m.

17    LOCATION:    Deborah Gordon Law

18                 33 Bloomfield Hills Parkway, Suite 220

19                 Bloomfield Hills, Michigan

20

21    REPORTER:    John J. Slatin, RPR, CSR-5180

22                 Certified Shorthand Reporter

23

24            (Appearances listed on page 2)

25
```

Page 14

1   because the County is a large organization, a big
2   entity, with various aspects, including the sheriff's
3   department, the command center and so forth.  So, I have
4   no idea what they have and what they control.
5   Q.  **And you don't know whether you all operate under the**
6       **same auspices, the same manuals?  You don't know that?**
7   A.  Well, we operate under the same program.
8           Whether we operate under the same manuals because
9       the manuals have been updated, I don't know.
10  Q.  **Well, did --**
11  A.  The most recent people that -- our LEIN operators within
12      our office have gone to the most recent training.  When
13      everybody else went to their training, such as me, back
14      in 1981, I'm sure the manual has changed.  So --
15  Q.  **All I'm asking is, is it your understanding that**
16      **there's -- the same manuals are being used countywide,**
17      **or do you think you have a different manual than, say,**
18      **the sheriff's department has?**
19  A.  No.  I think the manuals are being used statewide --
20      countywide and statewide.
21  Q.  **Has your office, the prosecutor's office, ever issued**
22      **any directives to anybody in the prosecutor's office**
23      **with regard to proper usage of the LEIN system?**
24  A.  I don't know that I understand that question.
25  Q.  **Well, you've said you've got the manuals?**

Page 15

1   A.  Correct.
2   Q.  **Has the prosecutor's office ever put together anything**
3       **in writing from the prosecutor's office, not from the**
4       **State, telling people how to use or not use the LEIN**
5       **system?**
6   A.  No.  We use the LEIN manual and the LEIN guidelines.
7   Q.  **What is your job responsibility vis-à-vis the LEIN**
8       **system?**
9   A.  I am a LEIN operator, and I have been working in
10      conjunction with our LEIN TAC officer to make sure that
11      we are compliant with LEIN and their regulations and
12      policies.
13  Q.  **Why are you the person that's contacting the state**
14      **police about the LEIN usage at the County, in this case**
15      **the prosecutor's office?**
16          MR. FLEURY:  Objection.  He didn't say state
17      police.
18          But go ahead.
19          MS. GORDON:  Well, I have a letter right in front
20      of me that he wrote to the state police, Tom.  I'm
21      sorry.
22          MR. FLEURY:  I thought you meant this morning.
23          MS. GORDON:  No.
24          MR. FLEURY:  Oh.
25          MS. GORDON:  Well, he did talk to the state police

Page 16

1   this morning.
2   A.  LEIN Field Services is a component of the Michigan State
3       Police.
4           So, when we talk about LEIN Field Services, they
5       are under the auspice of the Michigan State Police --
6   BY MS. GORDON:
7   Q.  Yeah.  I knew that.
8   A.  -- so they're one and the same.
9   Q.  I knew that.
10  A.  Okay.  I am just clarifying.
11  Q.  But let's listen to my question.
12  A.  Okay.
13  Q.  Okay?
14  A.  Sure.
15  Q.  You're all set?  John will read it?
16  A.  Sure.
17  Q.  Okay.
18          (Record repeated by the reporter.)
19  A.  I don't know why I'm the contact person.  I think maybe
20      because I, as a police officer, had contact with LEIN
21      Field Services in regards to a couple investigations I
22      had to conduct.
23  BY MS. GORDON:
24  Q.  Well, have you been assigned or appointed by Eric Smith
25      or anybody else to be the contact person for the MSP

Page 17

1   LEIN Field Services?
2   A.  I don't know that directly -- I've just undertaken that.
3       Nobody made me the official contact person, so to speak.
4       They just allow me to do it because of my past contacts
5       with LEIN Field Services.
6   Q.  Well, you had some direct contact with Ms. Canfield at
7       some point?
8   A.  I did.
9   Q.  And you wrote a letter or letters.  So, obviously you
10      didn't just take it upon yourself to do that.  Somebody
11      told you to be in touch with her; correct?
12  A.  Yes.
13  Q.  And was that Eric Smith, or was that somebody else?
14  A.  I don't know that it was Eric Smith or somebody within
15      the administration.
16          So, somebody above me, somebody in the
17      administration, told me to contact the LEIN Field
18      Services people.
19          It's been some time.  I don't remember
20      specifically.  So, if you're looking for a specific
21      name, I can't answer you.
22  Q.  What do you mean "it's been some time"?
23          When were you first told that?
24  A.  When this development first came to light.
25  Q.  And what "development" are we referring to here now?

CRAIG KEITH                                          December 02, 2016

Page 18

1   A.   The issues that were brought to our attention by
2        Mr. Chuchran when he came back from TAC training.
3   Q.   Okay.  Gotcha.
4             Okay.  So, is that when you first got involved in
5        it?
6   A.   Yes.
7   Q.   Okay.  So, let me first get some background information
8        from you.
9             When did you become -- excuse me one second.
10            (Discussion held off the record.)
11  BY MS. GORDON:
12  Q.   When did you first become employed by the prosecutor's
13       office?
14  A.   August of 2011.
15  Q.   And you were retiring from where at that time?
16  A.   Clinton Township Police Department.
17  Q.   And you had been there how long?
18  A.   Twenty-six years.
19  Q.   And what was your rank when you left?
20  A.   I was the detective lieutenant.
21  Q.   Okay.  And how long had you held that position and rank?
22  A.   I held the rank for ten years, and I was a detective
23       lieutenant for seven of those ten years.
24  Q.   Okay.  And when did you first get to know Eric Smith?
25  A.   I don't know.  I knew of Eric Smith.  I don't know that

Page 19

1        I ever got to know Eric Smith until later in my career
2        from bringing cases up to the prosecutor's office.
3   Q.   Okay.
4   A.   I never had a personal relationship with Eric Smith.
5   Q.   Okay.  But at some point you got to know him?
6             You were in law enforcement.  He was doing what he
7        was doing.
8   A.   I would see him occasionally.  We would say, "Hi," meet
9        and greet in the hallway-type things, and that's pretty
10       much about it.
11  Q.   And what was your last day with the Clinton Township
12       P.D.?
13  A.   8-8 of 2011.
14  Q.   Okay.  So, you had this job lined up with the
15       prosecutor's office, obviously, by the time you left the
16       P.D.; correct?
17  A.   That's correct.  I tested -- yes, uh-huh.
18  Q.   Yeah.
19            And was your original contact for this position to
20       begin the process with Eric Smith?
21  A.   No, it wasn't.
22  Q.   Who was it with?
23  A.   Byron Satterly.
24  Q.   And did you know Mr. Satterly previously?
25  A.   Yes.

Page 20

1   Q.   And --
2   A.   He --
3   Q.   Go ahead.
4   A.   We worked at the Sterling Heights Police Department, and
5        I last had contact with him in 1985 when I left the
6        Sterling Heights Police Department.
7   Q.   Had you stayed in touch in some way or another?
8   A.   Did not.
9   Q.   Did he contact you?  Did you contact him?  How did this
10       come about?
11  A.   We were working -- I was working a case, a homicide
12       case.  He was working for the prosecutor's office, and
13       he was handling the investigator aspect for the
14       presentation of the case in court.
15  Q.   When was that, roughly?
16  A.   2010, 200-- -- end of 2009, beginning 2010.
17  Q.   Okay.  How did you hook back up with regard to your
18       decision to retire from the police department --
19  A.   Uh-huh.
20  Q.   -- and your decision that you were going to either seek
21       or obtain employment from the prosecutor's office?
22  A.   That had been a thought process I've had for five, six,
23       seven years prior to my retirement.  I had ongoing
24       conversations with Ms. Therese Tobin during that course
25       and let her know that if a position became available, I

Page 21

1        would be interested in that position.
2   Q.   Ms. Tobin is an APA?
3   A.   No longer.
4   Q.   She was at the time?
5   A.   She was.
6   Q.   Yeah.  Okay.
7             And did she eventually let you know, or did
8        somebody else let you know?
9   A.   I don't know who -- she let me know, but also -- Byron
10       Satterly let me know also.
11  Q.   Okay.  And when you heard there was an opening, is that
12       when you decided this would be a good time for me to
13       retire and take advantage of a potential opportunity?
14  A.   The economy forced my retirement and contracts forced my
15       retirement.  So --
16  Q.   I'm sorry?
17  A.   The economy and contracts with the Clinton Township
18       Police forced my retirement.
19  Q.   In what regard?
20  A.   Things were being taken away from law enforcement
21       officers.  We were coming to the end of a very
22       productive contract.  And I knew long-term I wouldn't be
23       there to recoup the losses that they were getting ready
24       to impose, so I chose other employment.
25  Q.   What were the losses, briefly?

CRAIG KEITH                                            December 02, 2016

Page 46

1    maintains agency terminal operator certification and
2    recertification testing; correct?
3    A.   That is correct.
4    Q.   So, Bob would be responsible for being sure, when he was
5         in that role, that people were properly certified;
6         correct?
7    A.   Correct.
8    Q.   And also the LEIN officer coordinates the agency audit
9         with LEIN auditing staff; correct?
10   A.   That is correct.
11   Q.   And how often are you audited?
12   A.   I believe we have a self-reporting audit yearly and an
13        on-site audit every three years.
14   Q.   Okay.  Okay.  So, Bob then went off to training,
15        correct, after he was selected?
16   A.   Bob received training.  Correct.
17   Q.   And how long is the training?
18   A.   That, I do not know.
19   Q.   This was out-of-the-office training?
20   A.   Yes.
21   Q.   And you said you met with him after he started raising
22        issues upon return from training; correct?  Or after he
23        became a TAC officer?
24   A.   Can you be more specific?
25   Q.   I'm just going with what you told me a little bit

Page 47

1    earlier in the deposition.
2         You said you met with Bob after he became a TAC
3    officer.  We were going through the counseling.  I was
4    asking about counseling.
5         MR. FLEURY:  Right.
6    A.   Bob came to see me.
7    BY MS. GORDON:
8    Q.   Okay.
9         (Discussion held off the record.)
10   BY MS. GORDON:
11   Q.   Now, at the time Bob became a TAC officer, had you
12        previously worked with Liz Canfield or anybody else from
13        the Michigan State Police with regard to the LEIN
14        operation?
15   A.   In any capacity?
16        Yes, I've worked with Liz in LEIN -- from LEIN
17        Field Services in other investigations I've conducted.
18   Q.   And in what regard?
19   A.   The misuse of LEIN by law enforcement officers.
20   Q.   Was there an investigation being done?
21   A.   During my time as a lieutenant with the Clinton Township
22        Police, yes.
23   Q.   Okay.  But I'm talking about once you got to the
24        prosecutor's office, had you had any dealings with Liz
25        Canfield?

Page 48

1    A.   Prior to this incident?
2    Q.   What do you mean by "this incident"?
3    A.   Well, Bob becoming TAC.
4    Q.   Yes.
5    A.   Prior to Bob becoming TAC?
6    Q.   Yes.  Yes.
7    A.   I honestly don't recall.
8    Q.   And when Bob returned from TAC, he voiced his concern
9         that there were things the office was doing that were
10        not proper; correct?
11   A.   Yes.
12   Q.   Okay.  And what were the things you recall him
13        mentioning that needed to be corrected?
14   A.   We were keeping the LEIN in files that had been closed.
15        We were running LEIN in our office for outside agencies
16        when they came up for warrant requests, if they didn't
17        have it done.
18   Q.   Such as what outside agency?  Can you just give me --
19   A.   Other law enforcement agencies throughout the county.
20   Q.   Okay.
21   A.   There's a third one.  It's escaping me now, so let me --
22        please give me a minute.
23   Q.   Uh-huh.
24   A.   The filing in closed cases, outside LEIN, and the third
25        one is escaping me now.  I hope it will come to me.  I

Page 49

1    can't remember.
2    Q.   What about fingerprinting?
3    A.   I don't remember him bringing fingerprinting issues.  I
4         don't remember that.
5    Q.   That doesn't ring a bell with you?
6    A.   Not at that time.
7    Q.   Well, when did you become aware that Bob was taking the
8         position that anybody using the LEIN system needed to be
9         fingerprinted?
10   A.   I didn't know that Bob ever took that position with me.
11        I don't recall him telling me that.
12   Q.   Well, at some point after Bob became a TAC officer, the
13        prosecutor's office decided they better get everybody
14        fingerprinted, and that wasn't that long ago.
15        Do you recall that?
16   A.   But that had nothing to do with Bob.  That was at the
17        recommendation and suggestion of the current TAC
18        officer, James Hall.
19   Q.   Okay.  So, then you didn't get the memo, I guess, that
20        Bob literally put in writing that people had to be
21        fingerprinted?
22   A.   I don't recall seeing that document.
23   Q.   Okay.  So, I'll read you a letter from Bob Chuchran to
24        the state police.
25        MR. FLEURY:  Well, can you give him the date?

CRAIG KEITH                                      December 02, 2016

---

Page 66

1  Q.  -- that everybody needed to be fingerprinted who was
2      working with the LEIN.
3          Did you become aware of that?
4  A.  I was not aware of that.
5  Q.  You don't deny it here today under oath, do you, that he
6      did that?
7  A.  I don't know what he did with Shelly.
8  Q.  Okay.  So, what was your role when Bob returned from TAC
9      training in finding out what his concerns were?
10 A.  I didn't have a role.  Bob voiced his concerns to me and
11     Byron Satterly, and we started addressing his concerns.
12 Q.  Okay.  And you knew that Bob was being referred to by
13     some people, at least, as "the LEIN Nazi" upon his
14     return from TAC training; correct?
15 A.  I had not heard him referred to as that.
16 Q.  You're not denying it here today, that people called him
17     that, are you?
18 A.  I have no idea what other people called Bob.
19 Q.  Okay.  You knew that people were not happy, some people,
20     that Bob was bringing back issues regarding the LEIN
21     that were going to cause additional work?
22 A.  No, that's not true.
23 Q.  Okay.  All right.  So, what is your meeting with Bob
24     about now?
25          MR. FLEURY:  Now, which meeting?

---

Page 67

1          MS. GORDON:  The only one he had.
2          MR. FLEURY:  No.  He had a meeting when he had his
3      concerns.  Then he had a meeting afterwards when he was
4      removed from TAC.
5          Which meeting?
6          MS. GORDON:  It's the same meeting, sir.
7          MR. FLEURY:  No, it isn't.  There were two
8      meetings.
9  A.  No, there were -- Bob --
10 BY MS. GORDON:
11 Q.  Okay.  Let's go through it, then.
12 A.  Sure.
13          Bob met with myself and Byron Satterly, the chief,
14     when he came back from TAC about his concerns for LEIN.
15 Q.  And then you called him in for a separate meeting?
16 A.  I did not call Bob in for a separate meeting.
17 Q.  He came in to see you?
18 A.  He came in to see me.
19 Q.  What was he coming in to see you about?
20 A.  Well, ultimately, from the conversation, he had been
21     removed from LEIN, and he wanted to have the LEIN
22     position returned to him.
23 Q.  You said he was removed from LEIN at the meeting.
24     That's what you said under oath.  It's here on the
25     record.

---

Page 68

1  A.  We have a misunderstanding, a miscommunication about
2      what meeting we're speaking of.
3  Q.  Okay.  When was -- what meeting was Bob Chuchran removed
4      as TAC officer?
5  A.  I did not remove Bob Chuchran as TAC officer.
6  Q.  Well, the record is going to show that you said
7      on the record he was removed from his position at that
8      meeting.
9          MR. FLEURY:  I object.  That is not what it says at
10     all.
11 A.  Right.  If -- I don't believe that's what it says, but
12     if I did say that, I misspoke, because I did not remove
13     Bob as the TAC officer.
14 BY MS. GORDON:
15 Q.  Who did?
16 A.  Chief Satterly.
17 Q.  And you knew about it in advance, though, didn't you,
18     before it happened?
19 A.  Yes.
20 Q.  And when did you learn about that?
21 A.  I don't have a date or a month.  I know it was after
22     Chief Satterly and I discussed it.
23 Q.  Okay.  And this was after Bob came back from the TAC
24     training and explained to you -- this is after that
25     meeting?

---

Page 69

1  A.  No.  It was after Bob was going around the office,
2      creating an uneasy environment, telling people they were
3      committing felonies because of the LEIN violations he
4      had learned of.
5  Q.  And when was that?
6  A.  After he came back from TAC training, which I don't
7      recall the month.  You provided me with the month of
8      January, so it was sometime after January 2015.
9  Q.  Okay.  So, you never heard Bob called a "LEIN Nazi."
10          Who did you hear him say they were committing a
11     felony?
12          So, now, I mean, I'll -- what?  You're overhearing
13     this out of your own ears?
14 A.  People had come to me with concerns.
15 Q.  Okay.  Okay.  Who were those people, sir?
16 A.  Michelle McLaughlin.
17 Q.  Who is she?
18 A.  She's a support staff.
19          Specifically, her; Mike Torey.
20 Q.  I'm sorry.  What support staff role does she have?
21 A.  Presently, she -- I don't know what her --
22 Q.  No, no.  At the time.  At the time.
23 A.  She was support staff.  I don't know what court she
24     handles.  She -- staff handles courts.  I don't know
25     what courts she's handled.

---